Good afternoon. May it please the court, Linda McDermott on behalf of Ronald Knight. The single issue before the court is the ineffective assistance of counsel at the penalty phase of Mr. Knight's capital trial. And I think the way I want to start is I want to mention two circumstances relating to this case. First of all, in 1996, there had been a capital trial in a separate proceeding. And in that case, the jury had recommended a death sentence by a 12 to 0 verdict. And the trial judge there overrode that and imposed a life sentence. Mr. Knight was then charged with this homicide that actually predated the other homicide, which is the victim in that case. His name was Brendan Meehan. And so I'll refer to that as the Meehan case. And the victim in this case is Richard Kunkel. So this I will refer to as the Kunkel case. So in that respect, counsel did have information that had already been presented to a jury and a judge about mitigation of his client. There was certainly the jury came back 12-0 for death, but the judge found some of the mitigation obviously compelling. The distinctions between that case and the Kunkel case were that the judge in that case did not have the prior violent felony as the homicide of Mr. Meehan, because that was the case they were trying. And Mr. Kunkel had not yet been tried, and Mr. Knight not convicted yet on that. And also in that case, the judge didn't find the CCP aggravator. So the judge in that case had a single merged aggravator committed in the course of a robbery and pecuniary gain, and he did not find that sufficient to impose a death sentence in light of the mitigation that was presented. That said, the second thing I want to just mention is that when Mr. Sosa, who was the penalty phase counsel in the Kunkel case, was appointed, he had approximately five months before Mr. Knight asked the court to dismiss him and for him to proceed pro se. The guidelines, the case law at the time of this case would have been that an attorney would have the obligation to promptly investigate his client's background, social history, any of the information that could bear on the issue of life or death in the penalty phase. All right, so this is helpful. So can you just sort of chart the chronology for me? So Sosa's on the case for five months, then he's dismissed, in effect, for how long? And then how long is he sort of off the case before he's put back on the day of the first day of sentencing? Correct. So it was in early December of 1997 when he is dismissed. I should say he was appointed in June of 1997. So he had more than five months. The judge allows Mr. Knight to proceed pro se at that point and the trial begins in March of 1998, the guilt phase portion. At the guilt phase portion, sometime in that proceeding, Mr. Knight and Mr. Sosa have a conversation where Mr. Knight agrees to put Mr. Sosa back on as officially the penalty phase attorney. He had always been standby counsel for both the guilt and the penalty, even though he had been dismissed as Mr. Knight's attorney. He'd been told to be standby counsel and he had been consulting with Mr. Knight and had sat at the table with him during the guilt phase. The verdict of the guilt phase, this is a judge trial and I believe it's approximately March 16th or March 15th, right? Mid-March. Because it's going to be a judge penalty phase, there's a four-week gap. There's no consideration about keeping a jury hanging out there for a long time. So Mr. Sosa then has about four weeks before Judge Garrison actually sets the penalty phase proceeding. And that begins on April 15th. The day of the penalty phase proceeding, Mr. Sosa appears and says to the judge, I've spoken to Mr. Knight. I'm fully the attorney. I'm going to be presenting the evidence. He references that this is the agreement they came to back during the trial. What does the record tell us about the agreement that they came to during the trial? Because I guess I've been thinking, I guess I didn't realize sort of so much of the background that there was this agreement that Sosa was kind of back in before I guess sort of what he was formally appointed on the first day of the sentencing phase. Right. I mean, I don't have the specific language that he used, but I can give you, certainly provide to the court, the exact page of the transcript following the hearing if that's references that they've decided that he's going to take over and be the attorney. Yeah, that we came to this agreement on thus and such a date. I don't think he references a specific date, but it appears that it's sometime during the actual trial proceedings. And what we do know is that Sosa does in fact contact Dr. Strauss and Ms. Hessian in the beginning of April. He does the, he starts drafting up the motion for appointment of experts. He asks for an investigator in the beginning of April. He, there was about a week to 10 days between the guilt phase and the penalty phase where there's no activity according to his billing record. But he does start doing things and the judge, in fact, when he grants the motion for the experts, he does it non-proton to March 31st. So that's all going on. And essentially, I guess my point in explaining this timeline is that it's not until two weeks before the penalty phase that Sosa does anything other than speak to his client in relation to preparing for this, this phase. And there's just no explanation why in the five months that he had the case prior to his dismissal that he wouldn't have started working this case up, particularly in light of the fact that he had background information from the Meehan case. In that case, they put a witness on the stand who was a licensed clinical social worker who did a quite extensive social history on Mr. Knight and testified in that proceeding. And he didn't just do an interview with Mr. Knight. He did sort of a whole social history where he interviewed various people and he got records and he, court records and school records and things like that. And so he does this four page or so little social history and it's on page 252 of the record. And if you go through this, just this in and of itself, or his testimony is sort of very similar to this. There are so many red flags in here and things that would constitute mitigation that never get presented to Mr. Knight's sentencer in this particular case. There's information about Mr. Knight's substance abuse, the fact that he became addicted to crack cocaine in his late teen years and was using drugs at the age of nine. He was using drugs and alcohol shortly thereafter. There's information about him at the Okeechobee School for Boys that ultimately becomes the Eckerd Youth Center. He actually gives counsel the name of the witness who at the post-conviction evidentiary hearing here, they introduced the affidavit from Mr. Williams who talks about the trauma and the rapes and the beatings that Mr. Knight suffered when he was a student at the Eckerd Youth Center. I just want to be sure I understood that. So Sosa learned about Williams from Mr. Knight? Well, my point is that Sosa had this information from Mr. Otto, the social worker, and he had also in sort of looking at this from the Wiggins' perspective, what did he have? What could he have learned from what he had? And so my point is that just this little report, just that testimony that Otto gives in Meehan is so valuable and could have been used to follow up on a whole set of mitigation that didn't get presented here. And he was facing a case that was going to be arguably more aggravated because he knew he had this prior violent felony of the homicide of Meehan to deal with. So to not sort of go and track down the mitigation, some of it's already been developed, but some of it still needs to be developed and strengthened. When Abby Strauss testifies at the trial, he is quite candid. I have not been given anything related to the Kunkel homicide. I saw Mr. Knight in that two week period of time when he gets retained. He did go see Mr. Knight again, but he doesn't have a piece of paper. He doesn't have a record, nothing, no witness testimony. And one of the things that the trial judge does is he faults Dr. Strauss and he does find the statutory mitigator that the crime was committed while Mr. Knight is under extreme emotional disturbance or distress. But he says that there's nothing in the record showing that he was at the time of the crime. Well, the experts hadn't been given anything about the crime. And at the time of the crime, I'd point out at the trial record itself, Dane Bernalt, one of the co-defendants testified about the circumstance of the crime and used the word that following the shooting, Mr. Knight was going crazy and he was running around. And this is not sort of the calm, calculated, cool defendant who did this in a highly premeditated way. So had this information been given to Dr. Strauss, certainly he could have talked about the CCP aggravator and then also talked about the circumstances of the crime and how that description by Bernalt didn't match the information that the state was trying to assert, which is that this is a highly premeditated execution that had been planned since earlier in that evening, that Knight knew exactly what he was going to do. Was Mr. Sosa deceased at the time of the state post-conviction hearing? He was. Yes, Your Honor. He didn't testify at that hearing? He did not. Guilfay's counsel, Ms. Perry. He hadn't been deposed before he passed away or anything like that? There was no, nobody was able to ask him why he took or didn't take certain steps? No. Right, okay. No. So just in, I think that this is all very relevant to this court's review to think about this in the timeline, what was available to Sosa and what he used. What he did was two weeks before the penalty phase, he goes and he gets Strauss and Ms. Hessian and he brings them in to testify. They do go see Knight and then he puts the mom and the sister on. And that's the extent of his penalty phase in the Kunkel case. So I think under Wiggins, in terms of deficiency, there's so much evidence out there that he did not follow up on that was just at his fingertips had he just gone and taken that memo or taken that testimony and developed that further, knowing that he's got a bit more of an issue in terms of the aggravation. I'm going to ask Ms. Campbell the same question when she gets up, but I'll ask it of you first since you're here. Despite what it said, do you think the Florida Supreme Court engaged in a prejudice analysis of sorts in addressing the performance prong of Strickland? Well, I think that there is an overlap there. And I think by discrediting the various witnesses and saying that Lipman wasn't credible and that we wouldn't consider the Pearson testimony because he had an outstanding charge, that they essentially were doing the weighing, but they were just saying that it related to the deficiency issue. I read it. I've read it several times. And every time I read it, I come away with, and I'm not saying it's right or wrong, but I come away with the impression that there was some prejudice prong analysis within a purported discussion of performance. Yeah, I think that's absolutely right. I mean, that is, I think, the only way you can read the way that they are discussing the mitigation that was presented at the evidentiary hearing. They're actually taking it and using it to determine whether or not it changes the outcome versus should Sosa have done something. For example, with the issue about whether or not it was deficient that Sosa didn't go and speak to various witnesses, they never mentioned these issues that there are witnesses available that Mr. Williams' name was in this report. It was given to him by Mr. Knight. Instead, they try to say that the affidavit itself didn't come into evidence. It was only proffered, which I think is a problem because, obviously, the experts were relying on it and talking about it. So it certainly could have been considered as mitigating and part of the story of Mr. Knight's social history and circumstances. I didn't mean to cut you off. No, you're fine. But before we leave Judge Jordan's question, because he's read my mind, I literally have a note at the top of my paper here that says, even though it looks like the Florida Supreme Court said it was doing only a performance analysis and didn't need to get to prejudice, as I read at least its analysis of several of the witnesses, this is fundamentally a prejudice analysis. They're sort of saying, this stuff wouldn't have mattered. It was cumulative. We wouldn't have considered this testimony. That sounds like prejudice to me. And if that's true, then doesn't that, or might it not, sort of rejigger the standard of review? So instead of looking at prejudice de novo, now we're looking at prejudice through the lens of 2254 and all of the deference that comes with it. Because the Florida State Court has actually done, whether it said it was doing something else or not, it engaged in a prejudice analysis, and that analysis is due the deference under 2254. Well, they didn't cite to the law, so we don't know that they used the correct standard. So I would say that that's a problem to then say, let's give them deference because it looks like they did it. They would have had to say, this is what Strickling calls for. This is what we're required to do, and they didn't do it. But I don't disagree that there are some comments that seem exactly like it was more of a prejudice analysis than it was a deficiency analysis. It was very similar to what they did in the Porter case, where they just either ignored information like the substance abuse. It doesn't get mentioned. The fact that a child at nine years old starts using drugs and nobody's concerned that that would be one of those distinct human frailties of his life that would call for explaining and understanding is that this guy then goes on to commit a horrific crime. And does that add into whether or not he's deserving of the death penalty? So one way of, I guess there are two maybe even more possible ways of interpreting what the Florida Supreme Court did. One is the way that Judge Newsom just articulated. Another one is to think that you take the Florida Supreme Court at its word, but then potentially apply not the unreasonable application prong, but the contrary two prong and say, to the extent you were doing a performance based analysis and only a performance based analysis, there was at least some error by injecting prejudice prong considerations into that analysis. So I don't know what the answer is, but I certainly have those questions like Judge Newsom. I agree 100% that that is certainly a problem that they didn't really discuss the deficiency so much on the deficiency prong. And so that is contrary to and unreasonable in terms of what they're supposed to be looking at under Wiggins, the red flags, the things that are out there, what's available to him. And then as to the prejudice, they're clearly taking this evidence and then not analyzing it, not weighing it, not bringing it within the analysis of Porter and Wiggins and things like that. Let's assume that the contrary two interpretation is the right one. Assume that for a second. So that means that this court as a panel would get to de novo review of a prejudice issue if we reached it. Under regular de novo review, prejudice prong of Strickland, how do you get around the fact of the multiple murders? It seems to me that is the hard issue for you. Giving you everything else, which is the lawyer should have done more. The lawyer had the ability to do more. But some of the evidence that I want to catch this the correct way. Some of the evidence that Mr. Knight thinks should have been presented at mitigation. Some of it was presented, albeit in a different way, right? Some of his relatives testified. You had Dr. Strauss testifying. And so what you have is a minimal, maybe deficient level of mitigation evidence. More evidence that you say should have been presented. But against that, you've got not only the way this crime was committed, but you've got the other murder. How does that stack up in your view? Well, there's no doubt that that going in the trial attorney would know that that's a weighty aggravator. But had he done a thorough and competent investigation and presentation, he could have put on two mental health statutory mitigators. At the trial, the judge found the extreme mental or emotional disturbance and gave it consideration, but also said, also made this comment that Knight didn't prove that it did in fact exist. So that's sort of a problem. And on that, I would also say the state argued to the court that the experts conflicted with each other, and therefore they shouldn't be given much consideration, their testimony. Whereas in post-conviction, you have a consistent picture of this individual as a severely mentally ill man who suffers from paranoid disorder, and that impacts all of his day to day functioning. And I know the experts tried to describe what it's like to be suffering from this paranoia, and it's, I mean, difficult to say the least, but it impacts every decision, every choice, everything you're thinking about as this individual. So they also- What was the time lapse? I know what you explained about the sequence of the two murders. What was their time lag in terms of when they actually occurred? The Kunkel one and the Meehan one. So the Kunkel murder occurred on July 8th of 1993, and the Meehan murder occurred on May 8th of 1995. There was a portion of that where Mr. Knight was incarcerated. However, he also was out on bond on the Kunkel case for several months preceding them non-processing that case. So there was time when he was not incarcerated during those almost 18 months or so. But just going back to more of sort of the prejudice in the post-conviction evidentiary hearing, the experts were clear that the paranoid disorder, as well as the substance abuse and the level of the substance abuse, would also establish the other mental health mitigator that his ability to conform his conduct to the requirements of the law was substantially impaired. That was not found at the time of the trial. There was also the sexual abuse, which is extremely a gripping and compelling mitigation of what happened to him as an act. Oh, please go ahead. No, I interrupted you before and you let me go. Oh, while we've got you. So absolutely, I mean, the Williams affidavit is one of the most nightmarish accounts of a life that I can imagine. And I know that that was not admitted into evidence, but it was proffered. And my understanding is neither the habeas court nor the Forsman court mentioned the Williams affidavit. So where does that fit into the Strickland analysis from your point of view? I think that that's a problem because they ignored that evidence of mitigation, just like they did in Porter. They ignored evidence of his child abuse and things like that. They minimized things. In this case, they just flat out never talked about substance abuse, never talked about the trauma. And the thing about the trauma was that the experts were able to talk about that based on the Williams affidavit. That was completely appropriate for them to discuss that and essentially bring it into evidence in that in that frame. And yet the Florida Supreme Court still ignored that. Can I just be sure I understand? So it comes into the performance prong because not more was done to develop that evidence, I guess, am I understanding your argument correctly? And then on the prejudice, just that it just wasn't weighed at all. It was not weighed, nor was this the substance abuse. And that is a recognized area of mitigation in the state of Florida, both as to the acute use of it, which Pearson and Bernal testified that there was alcohol, cocaine use, marijuana use leading up to the crime in the days leading up to the crime. And then there was some conflict about what drugs had been used on the day of the crime, but there were clearly drugs and alcohol used on the day of the crime. And then it's also mitigation in terms of the length of the abuse. When did it start? What does that tell us about this person? And obviously, this is an extremely troubled, struggling young man who is essentially evicted from his home by one of his mother's boyfriend and is living in the woods. I should mention that in the Otto, because that comes up with the sister, Teresa Fowler, and the way that the Florida Supreme Court dismisses her testimony. But in Otto's report, it's interesting because in one of a record, the DOC Brevard reports, he says, Ronald said, so Ronald was telling someone else years before the crime that he was ejected from his mother's home. So that's different than the running away terminology that's used in the things like that. So I would say had, and I know Judge Newsom, when you granted a COA, you mentioned that a lot of these, there are sort of two sides to it. Could it be that he didn't adequately prepare the witness? And I would say that that's exactly what happened. He didn't sit with Ms. Fowler and discuss things that were in other records, in objective records, and ask her to explain, well, when you say he had a roof over his head, why does it say here he was ejected? And that's the kind of mitigation interview that has to be conducted. Family members are often protective of one another, or they just might not have been there at the time. She said she went to live with her grandmother for a period of time. So it's important to really get to those matters. And just jumping back on the deficiency there, he didn't do that. And I think that that's the explanation as to why her testimony seemed to be somewhat different, and the focus was somewhat different when she came in in the post-conviction hearing, and was much more forthcoming, and not even forthcoming, but just was able to actually explain what had happened in this house to her brother as a young child. Can I ask you just one further? I know, but the stakes are high. I'm not concerned too much about the time. So the Williams affidavit. So your contention is not that the post-conviction court was wrong to exclude it as a matter of hearsay, right? So it's excluded as a matter of hearsay, but instead that it wasn't sort of like properly factored in, I'm not going to say smuggled in through the expert reports, but sort of factored into the expert reports? No, they were absolutely wrong to exclude it. In Florida, hearsay is admissible. And there's no explanation, as I was not state court counsel, as to why the state court did not, that they sustained that objection. It should have come in as substantive evidence. It is error. It should be before this court as substantive evidence. But it still came in through those experts. So it can come in through however you want to put it in. The fact that Dr. Harvey talked about it, talked about the extreme trauma that he underwent while he was a student there in the custody of the state, that is compelling and has to be considered in terms of the prejudice analysis. And the Florida Supreme Court did not do that. And that is contrary to and an unreasonable application of Porter and Wiggins and Rompilla. May I reserve the rest of my time? You have it reserved. We'll give you your full time for rebuttal. Thank you. Ms. Campbell. Good afternoon. May I please the court? Leslie Campbell with the Attorney General's Office on behalf of the state. What needs to also be added to the history of this case is that the two experts, Dr. Strauss and Ms. Hessions, did a full workup and testified at the prior murder trial, the one from Mr. Meehan. So they had an understanding of Mr. Knight. Then when called upon in the Kunkel murder, they just reiterated and updated their information. Now, as far as the affidavit, the affidavit does not come in under Florida law because it is hearsay. While it may be relied upon by the experts and may be used by those experts, it doesn't come in as substantive evidence. Countering that Williams affidavit is the . . . Before we go to what the counter is, and I'm sorry that I'm not up to speed on I guess on a post-conviction petition, hearsay rules don't matter or something? So you say . . . No, post-conviction rules matter in . . . I mean, the evidence code matters in post-conviction. What is being referred to is during a penalty phase, hearsay is admissible if the state has a reasonable opportunity to rebut. We can't rebut an affidavit. Nonetheless, the experts were allowed to rely upon it. Now, the counter to that affidavit is twofold. Number one, there was an employee from the Eckerd School who testified. That's Mr. Zebedee. Number one, he couldn't remember . . . he thought he remembered a Mr. Knight, but it was the wrong Mr. Knight. He remembered an African-American and Mr. Knight is Caucasian. So he couldn't say for a fact that Mr. Knight was abused at the school. He couldn't say for a fact that there was abuse other than what was in the . . . He never witnessed abuse, Mr. Zebedee. But if he just knew about another Ronald Knight, how does that exclude the possibility that there were two Ronald Knights, one of whom was abused and one of whom was not, one of whom was Caucasian, one of whom was not? We're not disputing the fact that Mr. Knight, Ronald Knight, was at that school. We're saying . . . So if he was at that school, then this witness's statement didn't preclude any possibility that our Mr. Knight was, in fact, abused as the Williams affidavit indicated. Well, Mr. Knight himself denied any abuse. While he, at some point, suffered some trauma and loss of a testicle, he never, ever, ever told any of his experts that he was abused. Well, that's another . . . that's a different counter. But I'm saying . . . I'm saying there are two counters. I know, and I'm suggesting to you that, from my perspective, that first counter isn't worth much because if you admit that Mr. Knight was at Eckerd, the fact that this other witness knew another Ronald Knight who was of a different race and wasn't abused doesn't say anything about what happened to our Mr. Knight. It's one thing if you said there was only one Ronald Knight at Eckerd and Mr. Williams was mistaken about who that Ronald Knight was because we have evidence that there was another Ronald Knight, but if you admit there were two, then this affidavit says nothing pro or con about what may have happened to Mr. Knight. Okay, so let me ask you the question that I asked, Ms. McDermott, which is, the Florida Supreme Court says expressly that it is doing only a performance analysis under Strickland. Yet, I cannot get the nagging feeling out of my head that it is partly doing a prejudice analysis in part. What do you say? I think they were doing a prejudice analysis in part because of the close link to the evidence that they were analyzing. So is that contrary to under 2254? They say they're doing performance, but they're applying the wrong performance standard? No, I don't believe they were applying the wrong performance standard. They still were analyzing the evidence. Remember, we didn't have Mr. Sosa. I know, but the way you analyze that evidence, and I know we're giving deference, but the regular way you would analyze that evidence is to say, you know, this witness had issues and the lawyer had reasons for not calling the witness because it could have been a double edged sword or the testimony was a limited probative value, et cetera, et cetera. But you don't decide performance by doing a hindsight analysis of whether or not, had that testimony been presented, it would have made a difference. That's not correct as a legal matter, right? In this particular case, we don't have the strategy of Mr. Sosa. I know. But what we do have is we have the same experts who testified for the Meehan murder testifying for the Kunkel murder, and we have those experts looking at this new information that was brought out at the post conviction, and while we only had Dr. Strauss testify, he didn't change his testimony. He did not change his opinion. So in analyzing that, it does kind of use a little bit of the prejudice analysis. We have the performance where he says, I've looked at the new information. I'm not changing my opinion. But that also then kind of morphs into a prejudice analysis because if he doesn't change his analysis of mitigation and aggravation, doesn't change. Again, with Pearson. Pearson did not testify at the first trial, excuse me, at trial for the Kunkel murder. He comes forward and now he embellishes the amount of drugs that are used. Dr. Strauss took that into consideration in reassessing his opinion. Dr. Strauss also took into consideration the testimony of, or the report of Dr. Littman, who relied solely on Tim Pearson to determine, to reject what Dan Bernal said regarding the reject Knight's assessment and to then say, well, he was under the influence of all of these drugs. Dr. Strauss took that into consideration and he again, didn't change his testimony. Didn't change his opinion. The court in the Florida Supreme Court in analyzing that, in analyzing Pearson and Littman, clearly would be looking at both performance and a similar analysis would have been done for prejudice because Littman could not tell you, could not tell us how many or how much of any particular drug or how it really affected the defendant. And to the extent that he did, Dr. Littman's testimony again is rejected as not credible because he relied on another non-credible witness. So when you're looking at the analysis of Littman and Pearson with regard to drugs, it again, as I say, takes into consideration the prejudice prong. With regard to what Mr. Knight's sister testified to, there were things that she discussed during the trial that during the period of time for post-conviction . . . Let me interrupt you for a second because I want to make sure I have this right. You think that because the Florida Supreme Court in part performed the prejudice analysis that we have to accept that determination as having been made and then give it deference under AEDPA? No, Your Honor. I accept that they said they did not do a straightforward prejudice analysis. What I am saying is that they did a prejudice analysis as part of their deficiency analysis just because it lent itself to that. I'm saying you can de novo on the prejudice analysis. Okay. I understand. I didn't mean to . . . No, it's quite all right. I'm just taking the Florida Supreme Court at their word. Okay. With regard to the sister now, she had this epiphany because of further consideration over time and because she then became a mother. Now, how you're going to convince somebody or prepare them differently requires too much of defense counsel. Defense counsel can discuss that a poor childhood is mitigating or an abusive childhood is mitigating, but the defendant got the benefit of a poor childhood. It was given weight in the sentencing order. The mental mitigation was given weight in the sentencing order. What we have is basically either cumulative evidence, we have refuted evidence, we have a doctor that doesn't change his testimony, and you can't just bring in a doctor hoping for a more favorable opinion and say what defense counsel did was deficient. With regard to Zebedee again, I think it's important that he wasn't able to identify the defendant in court even though that was the allegation that he was going to be able to tell that this was the defendant or this was the person that he had in his school. Overall, SOSA had the same mitigation that was brought out in post-conviction and even if you give additional credit to the post-conviction mitigation, it is not going to overcome cold, calculated and premeditated. The testimony is pretty clear that the defendant got out, told the victim to take his pants off and then shot him in the back. It was something that Mr. Knight had planned even though he hadn't shared the plan of the killing with his co-defendants. We also have the prior violent felony which was done in a very similar manner while Mr. Knight was out on bail for the Kunkel murder. We have the defendant committing the exact same type of murder initially with Mr. Kunkel and then while out on bail with Mr. Meehan and that's the evidence that the trial court relied upon in coming up with cold, calculated and premeditated and the prior violent felony. The robbery and the pecuniary gain during the felony murder during a felony or the murder during a felony for robbery and the pecuniary gain were merged. But the CCP and the prior violent felony are extremely, extremely weighty circumstances in Florida and the minor mitigation that came out in the post-conviction certainly it didn't change the opinion of the expert and it doesn't change the prejudice analysis whether it be under a de novo review or if deference is given. Unless the court has any other questions? Mm-hmm. We appreciate it, Ms. Campbell. Thank you. Thank you. Just rely on the brief and ask you to affirm. Just as to the Williams affidavit, in Garcia versus State the Florida Supreme Court said hearsay is admissible at a capital felony, I'm sorry, at a capital penalty phase. When you're doing a post-conviction evidence you're hearing obviously you're putting on evidence that you're saying could have been put on at your penalty phase and there was ample opportunity for the state to go meet with Mr. Williams. This was not a post-conviction evidentiary hearing that went off in the course of a day or two. There were multiple gaps in the hearing. Had they wanted to speak to Mr. Williams they could have. It should have come in as substantive evidence and it is before the court as to Dr. Harvey's testimony at the very least and the trauma that he says Mr. Knight experienced when he was at Eckerd Youth Center. Just as to Zebedee Fennell, his last name is Fennell, he's similar to Lieutenant Colonel Sherman Pratt who testified in the Porter case. Pratt didn't know Porter. He knew Porter. He could review his records from the military and see that Porter was in his unit and he came in and he told the post-conviction court what happened to that unit during the Korean War and explained the battles that were fought and the conditions that they were fought under and that was considered mitigating. He didn't say I saw Porter do X, Y, and Z. I know that Porter did shot this particular person or was shot. He could just say these are the circumstances under which Mr. Porter served. Fennell, likewise, came in and said these are the circumstances under which Mr. Knight was at the Eckerd Youth Center. It was an extremely violent place where the federal government got involved and eventually took the state's control of it away from them and a private company took over and Mr. Fennell discussed all of the various violent things that had been happening and how it was changing and how he was sort of trying. He bridged that gap from Okeechobee all the way to Eckerd and so he had a lot of information to share in terms of how it changed and things like that but at the time Mr. Knight was there, it was severely overcrowded. Violence was not unusual at all between students and as well as between the people who were supervising the children and the children and so his testimony is absolutely mitigating in that these are the conditions in which Mr. Knight spent 18 months of his life and it was not a good situation. It's the type of information that certainly should be considered mitigating. What do you do, I guess, as a factual matter with Ms. Campbell's point that Knight testified that he wasn't abused? And I think Pearson, right, said he would have told me if he'd been abused. No, Pearson said he wouldn't have told me. I think any reasonable capital attorney knows that a client is not going to want to discuss the sexual abuse that they've experienced and you have to go to the outside sources and Otto from Meehan served that up and said, you know, there was sexual abuse that had occurred at Eckerd. So you would have to go and find, and Knight gave Otto two names of people that he was friends with, one of those being Williams. So to not follow up with those people is so deficient and any reasonable capital attorney would do that, would follow up with those people because that was obviously, I think, Otto specifically said that was the point that Knight said his life changed dramatically. Let me ask you one other question. You've tried and I think we've cut you off, but you've tried several times to analogize this case to Porter and certainly procedurally Porter sets up pretty similarly in the sense that it's, you know, sort of a once dismissed standby counsel sort of parachutes back in. But isn't the case different from Porter in a couple of respects that in Porter, isn't the delta between the mitigation at sentencing and the mitigation on the evidentiary hearing a little bit greater in Porter? And more importantly, in the sense that there you very clearly have new, you have evidence that runs to new mitigating factors, right? Confirming sort of hardening conclusions with respect to existing mitigating factors. And then maybe more importantly in Porter, didn't one of the aggravators drop away? Whereas here you don't have that, right? Didn't the HAC aggravator in Porter drop away? It did on the direct appeal. You're correct on that. So, I mean, isn't it a little bit different from Porter in the sense that the delta both on the mitigation side is greater and on the aggravator side? Well, I would also point out Porter was a double homicide in this, you know, at the same time of a mother and of his ex-girlfriend and her new boyfriend. So, there was two murders and two death recommendations in that case. And obviously Porter's heroic military service is outstanding mitigation. However, every court that looked at it before the U.S. Supreme Court, other than, I'm sorry, the district court judge found, had reversed the floor of Supreme Court, but then was reversed by this court. So, found that it wasn't substantial, it wasn't sufficient. And I would note that even at Porter's trial, there was reference to his military history. No one outlined it the way that Pratt outlined it during post-conviction, but it was certainly out there that he had served in the Korean War and fought on those battlefields. So, while the jury had that, it obviously substantially changed when we got to post-conviction as to understanding exactly what he was involved with. But what I would say is, you know, the respondent keeps arguing that Dr. Strauss didn't change his testimony and he didn't change his diagnosis. But he says, I didn't know this guy when I testified. I know so much more about him. And he outlines everything he was given and all the information he had. And he says, this strengthened it. The substance abuse in and of itself gives me all sorts of information about, that adds to his paranoia because, you know, alcohol and drugs, they also create sort of a level of paranoia. So, he said there's this synergistic effect going on. And I would say that we have a sentencing order. The judge was the sentencer. And what he said was, he indicates that the statment of the emotional disturbance, he says that there was no proof that Mr. Knight was, that was present at the time of the crime. He doesn't find the substantial impairment. He says he may have been impaired. But now we have that. Strauss gave us that in post-conviction with all of the information he was given about the drug and alcohol abuse. So, I would say there's a lot of similarity into the quality of the mitigation in post-conviction versus the quality of mitigation at the trial. All right. So, can I ask you just a factual question? Yes. And I just may have this wrong. I'm looking at page 23 of your brief. You say Pearson also testified that he knew Knight suffered a ruptured testicle at Okeechobee and that Knight had described to him his involvement in several fights at the school, but that Knight would not have told him if he had been sexually molested while there. Right. Right. So, I thought you told me that you said Pearson said he would have told him. No, Pearson said he would not have told me that. Okay. Right. All right. Very well. I just wanted to make sure I had it straight. Just one last thing is, when you look at the way the trial court analyzed Mr. Knight's testimony, you said that the evidence established that the defendant came from a broken home and had a less than ideal childhood. Unfortunately, in this day and age, his situation is not uncommon. So, that was his analysis of after hearing what was put on at the trial, that that was not an uncommon kind of reaction to a divorce. Well, with the testimony that was put on at the post-conviction evidentiary hearing, I submit that the evidence in mitigation has changed drastically and isn't cumulative and isn't the same as what the trial court heard. It's very different and the sentencing order demonstrates that, quite frankly, the judge didn't give it much weight at all. So, I would ask this court to find that Mr. Knight has established that the Florida Supreme Court's opinion was contrary to and unreasonable application of Strickland and grant him a new penalty phase. Thank you. To both counsel, Ms. McDermott, I know the court calls on you to take some of the toughest cases we have and we always count on you to educate us as you've done today. Ms. Campbell, I think two of the three of us at least were in AG's offices. And that was really one of the best jobs I ever had, really. So, we appreciate your presentation as well. Thank you. That concludes this hearing. Court's in recess until tomorrow morning.